Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1834 | **DATE** | 3/28/2002 |
| **CASE TITLE** | Jeremiah Mearday vs. City of Chicago, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order. Defendant Officers' motion for summary judgment on Counts I and II [145-1] and the City of Chicago's motion for summary judgment on Count III [136-1] are granted. Counts IV and V are hereby remanded to the state circuit court from which they were removed. Defendant Officers' motion to strike [163-1, 164-1] are denied as moot. Judgment is hereby entered in favor of Defendant Officers and the City of Chicago and against Plaintiff on Counts I, II and III which involved federal claims. Plaintiff's motion to compel against the United States [182-1] is denied without prejudice to its renewal in state court. This case is hereby dismissed.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR 2 9 2002 | |
| ✓ | Docketing to mail notices. | | date docketed | **185** |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| RO | | courtroom deputy's initials | | |

001-003327
Remark #2  4-12-'02

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION



DOCKETED

MAR 2 8 2002

JEREMIAH MEARDAY,    )
    )
    Plaintiff,    )    MAR 2 9 2002
    )
    v.    )    No. 00 C 1834
    )
CITY OF CHICAGO, a municipal corporation,  )    Judge Ruben Castillo
JOEL F. BEMIS #10354,    )
MICHAEL J. BROSNAN #4926,    )
WAYNE THOMPSON #179,    )
THOMAS KWASINSKI #9811,    )
JOHN FULLER #7650,    )
JAMES BENSON #4205 and    )
MICHAEL MAZZOCCOLI #14100,    )
    )
    Defendants.    )

## MEMORANDUM OPINION AND ORDER

This lawsuit involves the difficult issue of police misconduct. The plaintiff Jeremiah

Mearday ("Mearday") was the prior victim of an excessive police force incident which occurred

on September 26, 1997, and which ultimately led to the dismissal of two police officers on

March 12, 1998. This lawsuit, which was first filed in state court and removed to federal court,

involves a subsequent incident between Chicago police officers and Mearday which occurred on

March 19, 1998. The action is brought pursuant to 42 U.S.C. § 1983 (Counts I, II and III) and the

Illinois common law of malicious prosecution and *respondeat superior* (Counts IV and V).

Mearday alleges that he was stopped, arrested, improperly searched and falsely charged with

crimes as a result of a retaliatory conspiracy involving Defendant Chicago police officers Joel F.

Bemis, Michael J. Brosnan, Wayne Thompson, Thomas Kwasinski, John Fuller, James Benson

and Michael Mazzoccoli (collectively "Defendant Officers"). Mearday further alleges excessive

185

force on the part of Bemis, Brosnan, Thompson and Kwasinski. Finally, Mearday contends that the City of Chicago's ("City") alleged policy of failing to supervise and discipline police officers and investigate complaints led to the events that occurred on March 19, 1998.

Both Defendant Officers and the City have filed motions for summary judgment. Defendant Officers move for summary judgment on the Fourth Amendment claims (Counts I and II). They contend that their actions were not motivated by any retaliatory animus, and that such allegations are irrelevant because their actions were objectively reasonable. As such, Defendant Officers argue that they are entitled to qualified immunity on Mearday's Fourth Amendment claims. Defendant Officers further contend that they are entitled to judgment as a matter of law on Mearday's Fourth Amendment malicious prosecution claim. At the same time, Defendant Officers move to strike various portions of Mearday's response. The City seeks summary judgment on the *Monnell* claim (Count III), contending that Mearday cannot show the requisite elements of a policy claim. For the following reasons, Defendant Officers' motion for summary judgment as to Counts I and II is granted, (R. 145-1), the City's motion for summary judgment as to Count III is granted, (R. 136-1), and Defendant Officers' motions to strike, (R. 163-1, 164-1), are denied as moot. The state law claims of malicious prosecution and *respondeat superior* (Counts IV and V) are remanded to the state circuit court from which they were removed.

**RELEVANT FACTS[1]**

## I. Background[2]

Mearday alleges that the claims in this case relate back to the shameful events of
September 26, 1997. On that date, Mearday was beaten with a flashlight by Chicago police
officers James Comito and Matthew Thiel and left with injuries requiring a week of
hospitalization and reconstructive oral surgery. Charges were filed against Comito and Thiel.
After a Police Board hearing, at which Mearday testified, the two officers were separated from
the Chicago Police Department on March 12, 1998.

The beating and the legal proceedings surrounding the September 26, 1997 incident
garnered significant public interest. Both police and Mearday supporters regularly attended court
proceedings. The story was also reported in newspapers and on local television stations. In
addition, the beating and the legal proceedings surrounding it led to public protest, including
marches and rallies, by both pro-Mearday community members and police officers.[3]

## II. The Events of March 19, 1998

In the early morning hours of March 19, 1998, a Chicago police officer from the 25th

---

[1] The following factual account is taken from the parties' Local Rule 56.1 statements and
accompanying exhibits. Unless otherwise indicated, the facts included herein are undisputed.

[2] Defendant Officers object to large portions of Mearday's statement of additional facts –
dealing with Mearday's September 26, 1997 beating and the subsequent legal proceedings – as
immaterial and irrelevant. (R. 167, Officers' Resp. at 1.) While we agree that these facts are
largely irrelevant, as they attempt to prove the state of mind of Defendant Officers on March 19,
1998 – an element unnecessary to a Fourth Amendment claim – we, nevertheless, include some
of these facts so as to contextualize Mearday's claims.

[3] After the September 1997 incident, Mearday was harassed by unidentified police
officers. Police routinely drove through the alley near Mearday's house and in the street in front
of his house. Officers also shined their lights directly into Mearday's bedroom window.

3

District was shot in the face by an individual using a machine gun. The shooting occurred while the police were pursuing a van. Witnesses stated that more than one person was involved in the shooting. The shooting occurred at 3900 West Division, approximately three blocks from Mearday's home at 4022 West Crystal.[4]

Officers Bemis, Brosnan and Thompson reported to work at the 25th District between 8:00 and 9:00 a.m. Bemis, Brosnan and Thompson began looking for the suspected shooter, Maurice Albea, at about 9:30 a.m. Bemis drove the unmarked police car while Thompson sat in the front passenger seat and Brosnan in the rear seat. The three officers contend that before 1:00 p.m. they drove to known addresses for Albea and to other unspecified locations. At approximately 12:30 p.m., the officers asked Marcellus King to assist them in locating Albea, and King proceeded to ride in the police car with the officers.[5] In the approximately thirty minutes that King was riding with the three officers, they did not stop to interview anyone,

---

[4] Police radio tapes from the early morning and morning hours of March 19, 1998 reveal numerous statements by unidentified officers. The police audio tapes include the following statements by officers: at 2:37 a.m., "can get somebody to identify Jeremiah Mearday as one of the shooters" followed by a half-second of sound, which Defendant Officers characterize as laughter (R. 169, Officers' Add'l Exs., Ex. K, Tape recording of excerpts from police radio; R. 153-2, Pl.'s Exs., Ex. S, Police Tape Trs. at 20;); at 3:10 a.m., "Are there any other beats in the city the mayor wants to appease?" (*id*. at 26); and at 3:46 a.m., "Call Reverend Jakes and let him know too," (*id*. at 30), followed by, "I thought I saw Mearday jump out of the back of that van," (*id*. at 31), "Should call up the Police Board and let them know too," (*id*. at 31).

[5] Mearday states that he is "unable to accept . . . as true" paragraphs 6, 7 and 10 of Defendant Officers' statement of facts, citing doubts as to Bemis, Brosnan and Thompson's credibility and several facts irrelevant to the specific factual points. (R. 156, Pl.'s Facts ¶¶ 6, 7, 10.) We accept Defendant Officers' version of these particular facts, however, as Mearday has not produced any relevant facts to dispute these portions of Defendant Officers' account. Local Rule 56.1(b)(3)(A).

although Thompson alleges that Bemis and Brosnan stopped a few people on a street corner earlier in the day.  (R. 167, Officers' Resp. to Pl.'s Add'l Facts ¶ 55.)

At approximately 1:00 p.m., Mearday left his house and walked east on Crystal to a bus stop near the corner of Crystal and Pulaski to meet his girlfriend who was arriving by bus.  At around the same time, Bemis, Brosnan and Thompson were driving north on Pulaski and contend that they saw a black male, who they allegedly did not recognize as Mearday, walking east on Crystal toward Pulaski.  (R. 146, Officers' Facts ¶ 12.)  Bemis contends that Mearday was "looking around quickly, hastily."  (R. 167, Officers' Resp. to Pl.'s Add'l Facts ¶ 53.)  Mearday admits that the sight of the police car made him feel nervous and scared.  When Mearday saw the police car drive past, he turned around and walked back to his house.  Defendant Officers contend that Thompson then told Bemis to go around the block so that they could get a better look at the man who had turned around.  (*Id.*)  Bemis admits that he saw pictures of Mearday on television, although he denies recognizing him during the incident on March 19, 1998.  (R. 167, Officers' Resp. to Pl.'s Add'l Facts ¶ 61.)  Bemis drove the car around the block and stopped in the area in front of Mearday's house where Mearday was standing.

Mearday contends that the initial encounter with the three officers in front of his house began with Bemis stating, "Come here," as he had one foot out of the car.[6]  (R. 153-1, Pl.'s Exs., Ex. B, Mearday Dep. at 125, 127.)  Both parties admit that Bemis thought he saw Mearday stick

---

[6] In order to clarify the sequence of events leading up to the arrest, the Court relied primarily on Mearday's deposition testimony, given that some of the facts contained in Mearday's statement of additional facts were not presented chronologically.

his hand under his jacket and into his waistband, as if he had a weapon.[7] (R. 155, Pl.'s Add'l

Facts ¶ 64.) Bemis further alleges that he believed Mearday might be armed, although, in fact, he

was not. (R. 153-1, Pl.'s Exs., Ex. D, Joel Bemis Dep. at 86.) Rather, Mearday had a telephone

in his coat pocket. (*Id.*) Mearday maintains that he responded to Bemis' call by walking

backward with his hands up while stating that he had not done anything. (R. 153-1, Pl.'s Exs.,

Ex. B, Mearday Dep. at 124-125.) According to Mearday, Bemis then got out of the car with his

service weapon drawn. Mearday then turned around and "started going for" or ran to the door of

his house.[8] (*Id.* at 128.) He tried to enter the house, but could not grip the doorknob because his

hands were shaking. Mearday then turned around, saw both Bemis and Thompson holding guns,

put his hands up and dropped to his knees. (R. 153-1, Pl.'s Exs., Ex. B, Mearday Dep. at 142.)

Bemis reached Mearday first and tried to place a handcuff on Mearday's hand. Mearday pulled

away his hand, crossed his arms, fell on his chest and stayed on the ground. The officers tried to

pry Mearday's arms from underneath him to place him in handcuffs, but Mearday struggled to

keep the officers from handcuffing him. Mearday does not allege that the arresting officers beat

or punched him, but testifies that there was a lot of "scuffling." (R. 146, Officers' Facts ¶ 37; R.

---

[7] Although Mearday denies that he made any furtive move under his coat, (R. 154, Pl.'s Resp. at 9; R. 155, Pl.'s Add'l Facts ¶ 142), he pleads in his statement of additional facts: "Officer Bemis thought he saw Jeremiah Mearday thrust his hand under his jacket and into his waistband, as if he had a weapon." (R. 155, Pl.'s Add'l Facts ¶ 4.) Thus, Mearday himself alleges that Bemis *thought* he saw Mearday reach under his jacket.

[8] At his deposition, Mearday testified that he did not run to his home, but "put a little pep in [his] step," turned around at the door and then saw Bemis and Thompson with their guns aimed at him. (R. 153-1, Pl.'s Exs., Ex. B, Mearday Dep. at 127-28.) Later in the deposition, Mearday admits, however, that he ran to the door of his house. (R. 147-2, Officers' Exs., Ex. G, Mearday Dep. at 153-54.)

147-2, Officers' Exs., Ex. E, March 7, 2001 Trial Tr. at 101.) Although Mearday denied

intentionally striking any officer, he admits that he kicked Brosnan in the groin as Brosnan tried

to help Bemis handcuff him. (R. 146, Officers' Facts ¶ 31.) Thompson also tried to help Bemis

handcuff Mearday after handing the shotgun to Brosnan. Brosnan then issued a call for

immediate assistance because the three officers could not get Plaintiff handcuffed. Officer

Kwasinksi, from the 25th District, responded to the call and put his knee on Mearday's shoulder

to force him to release his right hand from underneath his body. Mearday stopped struggling,

was handcuffed, got to his feet and screamed that his name was Jeremiah Mearday. In response

one of the officers stated, "We know who the f— you are." (R. 155, Pl.'s Add'l Facts ¶ 72.)[9]

Mearday was then taken to the 25th District police station.

According to Mearday, upon his arrival at the police station, Mazzoccoli and another

unidentified police officer described as "Arab"-looking placed Mearday in an interrogation room

and handcuffed him to a ring on the wall. (R. 147-2, Officers' Exs., Ex. G, Mearday Dep. at 169-

171.) Within approximately twenty minutes, three officers entered the interrogation room –

identified by Mearday as Mazzoccoli, an "Arab"-looking officer and a short blond officer – and

strip searched Mearday. (*Id.* at 175-76.) The searching officers were identified by Defendant

Officers as Benson and Fuller. (R. 153-1, Pl.'s Exs., Ex. G, John Fuller Dep. at 95.) During this

first search, Mearday was stripped to his underwear and also had his boots searched.

(R. 147-2, Officers' Exs., Ex. G, Mearday Dep. at 178-79.) Sometime thereafter, the same three

officers reentered the room, closed the door and conducted another strip search of Mearday.

---

[9] Mearday testified that he thought "the big guy . . . in the uniform [Kwasinksi] made this comment." (R. 153-1, Pl.'s Exs., Ex. B, Mearday Dep. at 164.)

7

After the second strip search, Mearday got dressed and was re-handcuffed to the ring. The three officers then left the room. Thereafter, the short blond officer reentered the room and asked for Mearday's boots and Mearday kicked one boot over to the officer. The short blond officer responded, "[T]his is all I need," and closed the door. (R. 147-2, Officers' Exs., Ex. G, Mearday Dep. at 196.) Thereafter, Mazzoccoli and the "Arab"-looking officer entered the room, whereupon Mazzoccoli told Mearday that he was under arrest for resisting arrest, battery and possession of drugs. The officers claimed to have found crack cocaine in the boot they obtained from Mearday. Mearday maintains that he did not have any drugs in possession on March 19, 1998.[10]

Mearday was charged with three counts of aggravated battery, one count of possession of a controlled substance and one count of possession with intent to distribute. The charges of possession with intent to distribute and possession of narcotics were dismissed by the prosecution in May 2000.[11] The charge of aggravated battery against Thompson was dismissed

---

[10] Defendant Officers' version of the police station searches differs. (*See* R. 167, Officers' Resp. to Pl.'s Add'l Facts ¶ 84A.) They maintain that Benson and Fuller were in the interrogation room when Mearday was first searched, while Mazzoccoli stood in the doorway and Kwasinski stood in the hallway behind Mazzoccoli, looking into the room. They further contend that Benson patted Mearday down and searched his clothing. Fuller, Defendant Officers allege, picked up one of the boots, pulled back the insole, turned it upside down and shook it, whereupon a package of individually wrapped packets of cocaine fell out of the boot to the floor. Defendant Officers admit to a second strip search by Benson to search for additional contraband. None was found.

[11] The State dismissed the drug charges because of Benson's "key involvement as the chain of custody witness." (R. 153-2, Pl.'s Exs., Ex. Z, DeMatteo Dep. at 25-6.) The Assistant State's Attorney, Gabriel DeMatteo, was concerned about Benson's testimony regarding chain of custody given that Benson was the target of a pending federal investigation involving alleged narcotics activity. (*Id.* at 8-9.)

8

at trial.  Mearday was tried before a jury on the aggravated battery charges against the other two police officers and acquitted.

Currently before the Court is the Defendant Officer's motion for summary judgment as to Counts I and II on the grounds of qualified immunity and the City's motion for summary judgment on Count III.  For the following reasons, Defendants' motions are granted.

## LEGAL STANDARDS

A motion for summary judgment is granted when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the Court must view all evidence in the light most favorable to the non-moving party and draw all inferences in the non-movant's favor. *Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 540 (7th Cir. 1998).  The Court, however, need not defeat a motion for summary judgment due to "the mere existence of *some* alleged factual dispute between the parties," *Liberty Lobby*, 477 U.S. at 247, or the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In short, the Court must decide "whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1573 (7th Cir. 1989).

## ANALYSIS

### I. Claims Against Defendant Officers

Mearday's second amended complaint alleges various violations of his Fourth Amendment rights. In Count I, Mearday claims that Officers Bemis, Brosnan, Thompson and Kwasinski violated his Fourth Amendment rights by using excessive force during his seizure. In Count II, Mearday claims that Officers Bemis, Brosnan, Thompson, Kwasinski, Fuller, Benson and Mazzoccoli violated his Fourth Amendment rights by conspiring to arrest and search Mearday and by wrongfully arresting and charging him with criminal acts. Mearday alleges that Defendant Officers acted "without probable cause and solely for purposes of harassment and retaliation." (R. 15, Second Am. Compl., Count I ¶ 7, Count II ¶ 7.)

Defendant Officers moved for summary judgment on Mearday's Fourth Amendment claims, arguing that Defendant Officers are: (1) entitled to qualified immunity on Mearday's excessive force and unreasonable search and seizure claims; and (2) entitled to judgment as a matter of law on the federal malicious prosecution claim. Specifically, Defendant Officers argue that they are entitled to qualified immunity because their actions were objectively reasonable in light of the law clearly established at the time of Mearday's arrest.

#### A. Qualified Immunity

Qualified immunity shields those government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). As a preliminary matter, because the defense of qualified immunity only applies to officials acting within the scope of their discretionary authority, a defendant claiming

qualified immunity "must demonstrate objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Pyka v. Vill. of Orland Park*, 906 F. Supp. 1196, 1216 (N.D. Ill. 1995) (citation omitted).

After determining whether the official was acting within the scope of his authority, the courts employ a two-part test to determine whether a defendant is entitled to qualified immunity. *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). We must consider: (1) whether the plaintiff has alleged a violation of a federal constitutional right; and (2) whether those rights were clearly established at the time the violation occurred. *Id.* A plaintiff's allegations regarding intent or improper motive are only relevant to the first step of the qualified immunity analysis if evidence of improper motive is an element of the constitutional claim alleged. *Crawford-El v. Britton*, 523 U.S. 574, 588-89 (1998). If we find that the plaintiff's supported allegations have not established a violation of a constitutional right, we do not proceed to the second step of the analysis. *Billings v. Madison Metro. Sch. Dist.*, 259 F.3d 807, 816 (7th Cir. 2001).

At the second step of the qualified immunity analysis, the burden of demonstrating a clearly established constitutional right lies with the plaintiff. The Supreme Court has held that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citation omitted). To determine whether a right is clearly established, we look to Supreme Court and Seventh Circuit precedent. *Jacobs v. City of Chi.*, 215 F.3d 758, 767 (7th Cir. 2000). If there is no controlling precedent, we expand our review to all relevant caselaw in order to discern whether there was a trend in the

11

caselaw such that the recognition of the right was "merely a question of time." *Id.* (citation omitted). We can look to closely analogous cases – the case need not be "precisely on all fours on the facts and law." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994) (citation omitted).

In the instant case, the Court must initially determine whether Defendant Officers were acting within the scope of their discretionary authority.[12] Bemis, Brosnan and Thompson have shown that they were on duty on March 19, 1998, and they further maintain that they were looking for a suspected police shooter. The three officers contend that they approached Mearday to interview him because Mearday turned around and walked away when he saw their police car. Thus, Defendant Officers have put forth "objective circumstances" which demonstrate that their actions were undertaken pursuant to their duties. *Pyka*, 906 F. Supp. at 1216. In Mearday's response to Defendant Officers' motion for summary judgment, he focuses heavily on the fact that qualified immunity should not attach because Defendant Officers were acting outside their "official capacity." (*See* R. 154, Pl.'s Resp. to Officers' Mot. for Summ. J. at 7.) It appears that Mearday is now trying to argue that Defendant Officers were acting outside the scope of their

---

[12] We reject Mearday's claims of a conspiracy among the seven Defendant Officers. *See Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988) (plaintiff must show actual or implied agreement among defendants to deprive him of constitutional rights and actual deprivation of those rights in the form of overt acts in furtherance of the agreement). Mearday attempts to establish an implied agreement with allegations showing ill-feeling toward Mearday on the part of unidentified police officers or police officers in general. (*See* R. 178, Pl.'s Resp. to Defs. Mot. to Strike.) We cannot impute these generalized allegations to Defendant Officers so as to establish an agreement among these seven officers. Mearday offers the March 19, 1998 police tapes as evidence of an agreement, but those transcripts offer statements by unidentified officers, most made before Defendant Officers even came on duty. The statements also appear to be unprofessional banter, as opposed to conspiracy plans. Therefore, we reject Mearday's conspiracy claims, and, as such, the remainder of this opinion focuses on the actions of the four arresting officers, Officers Bemis, Brosnan, Thompson and Kwasinski.

authority as police officers, and that therefore qualified immunity should not apply. The Court

notes, however, that Mearday pled in his second amended complaint that Defendant Officers

"[a]t all times relevant . . . were acting within the scope of their employment as Chicago police

officers." (R. 15, Second Am. Compl., Count I, ¶ 4, Count II ¶ 4.) We hold Mearday to this

allegation in his complaint.[13] Therefore, we find that Defendant Officers were acting as police

officers, performing discretionary police functions and are thus entitled to claim the defense of

qualified immunity. We will now proceed to examine whether Defendant Officers are entitled to

qualified immunity on Mearday's Fourth Amendment claims.

### 1. Seizure

The Court first addresses Mearday's claim that he was wrongfully seized by Defendant

Officers, and their assertion that they are entitled to qualified immunity against that claim.[14] As

noted above, the first step of the qualified immunity analysis is deciding whether the plaintiff has

asserted a violation of a constitutional right. The constitutional right first at issue is Mearday's

Fourth Amendment right to be stopped by police only when the officers can "point to specific

---

[13] The Court emphasizes that Mearday has had sufficient opportunity to state his allegations. We have twice granted him leave to file amended complaints, (*See* R. 10, May 1, 2001 Order; R. 14, May 31, 2001 Order), and Mearday has had ample time since June 2001 to amend his complaint.

[14] Mearday was first seized within the Fourth Amendment when he dropped to his knees and yielded to police authority, not when he was initially beckoned to the car by Bemis. The Supreme Court has held that a person is seized within the Fourth Amendment if: (1) a reasonable person would believe that he was not free to leave; and (2) the subject yields to a show of police authority or is touched by police. *Cal. v. Hodari D.*, 499 U.S. 621, 625-28 (1991). During the initial encounter with Defendant Officers, Mearday did not yield to them but began to walk backward toward his house. Therefore, the initial encounter was not a seizure protected by the Fourth Amendment. *See Jones by Jones v. Webb*, 45 F.3d 178 (7th Cir. 1995) (police officer's attempt to call suspect over to his vehicle did not amount to a seizure under the Fourth Amendment because suspect was free to leave encounter and in fact did leave the encounter).

and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). *See also U.S. v. Withers*, 972 F.2d 837, 841 (7th Cir. 1992) (officer must be able to articulate facts that give rise to a reasonable suspicion that a person committed or is committing a crime). When deciding whether there was reasonable suspicion to support a stop, we must look at the "totality of the circumstances." *U.S. v. Cortez*, 449 U.S. 411, 417 (1981). As part of the Fourth Amendment reasonableness analysis, we do not, however, examine the actual motivations of the officers involved, but only whether a reasonable officer would have conducted the investigatory stop. *Whren v. U.S.*, 517 U.S. 806, 813 (1996) (discussing cases that "foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved")

After carefully examining the facts surrounding Mearday's seizure, we conclude that Mearday has not established an unconstitutional *Terry* stop. It is undisputed that: (1) the seizure took place in a high crime area[15] where an officer had been recently shot; (2) Bemis beckoned Mearday to the police car; (3) Bemis thought he saw Mearday thrust his hand under his jacket as if he had a weapon; and (4) Mearday responded to Bemis by walking backward and then by turning around and running to the door of his house. Given these facts, a reasonable officer would have an objective basis for detaining Mearday. A person's location in a high crime area

---

[15] Defendant Officers maintain that Mearday's neighborhood is a high crime area. (R. 146, Officers' Facts ¶ 39.) Mearday responds that he only "guessed" that his neighborhood was a high crime area. (R. 156, Pl.'s Facts ¶ 39.) Our examination of the record leads us to conclude that Mearday's neighborhood is a high crime area. Apart from the police shooting within several blocks of Mearday's house, Mearday testified at his deposition to the presence of ten different gangs in his neighborhood and drug activity. (R. 147-2, Officers' E's., Ex. G, Mearday Dep. at 23, 30-32.) *See U.S. v. Mitchell*, 256 F.3d 734, 739 (7th Cir. 2001) (describing a high crime area as one where there had been drug activity, shooting and gang violence).

and his flight from the police are both factors relevant to determining whether there was reasonable suspicion to detain the person. *See U.S. v. Quinn*, 83 F.3d 917, 922 n.2 (7th Cir. 1996) (stating that "courts may consider the defendant's presence in a high crime area as part of the totality of the circumstances confronting the officer at the time of the stop") (citations omitted); *Tom v. Voida*, 963 F.2d 952, 958 (7th Cir. 1992) (finding that "flight is certainly a relevant and probative factor" in supporting a finding of reasonable suspicion). Because Mearday has failed to show that his stop was in violation of the Fourth Amendment, Defendant Officers are entitled to qualified immunity at step one of the analysis.

Even if the Court were to find that the investigatory stop was not supported by reasonable suspicion, Defendant Officers would still be entitled to qualified immunity at step two of the analysis. Mearday has not come forth with any cases establishing the unlawfulness of stopping a person based on their location in a high crime area and flight from police. *See, e.g., Kernats*, 35 F.3d at 1176 (holding that the plaintiff bears the burden of demonstrating that a constitutional right is clearly established). In fact, an officer, in light of cases such as *Quinn* and *Voida*, might have reasonably believed that it was lawful to stop a suspect on the basis of location and flight. In short, the law as it stood in 1998 had not clearly established the unlawfulness of the stop such that we should strip the Defendant Officers of qualified immunity.

### 2. Arrest

Given that we have established that Defendant Officers did not violate Mearday's Fourth Amendment rights in stopping Mearday after he fled from the police, we next examine Mearday's claim that his arrest violated the Fourth Amendment. The constitutional right at issue is Mearday's right to be free from arrest without probable cause. We look at whether "the facts

15

and circumstances within the arresting officer's knowledge" would warrant a reasonable person to believe that a crime is being committed or has been committed. *Spiegel*, 196 F.3d at 723 (citations omitted). "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813. Guided by these principles, the Court examines whether a reasonable officer would believe he had probable cause to arrest Mearday.

Mearday was arrested at the point that he was handcuffed and brought to his feet by Kwasinski. Prior to the arrest, Bemis attempted to handcuff Mearday, at which point Mearday snatched his arm away. Mearday then fell to the ground, crossed his arms and fell on his chest. A scuffle between Mearday and the officers ensued. When Brosnan tried to help Bemis handcuff Mearday, Mearday kicked Brosnan in the groin. Thompson also tried to help Bemis handcuff a resisting Mearday. Because the three officers could not get Mearday handcuffed, Brosnan issued a call for immediate assistance and Kwasinski arrived on the scene. Kwasinski arrived on the scene and put his knee on Mearday's shoulder to force him to release his right hand. Mearday was then cuffed and taken to the 25th District police station.

On these facts, the Court finds that Officers Bemis, Brosnan, Thompson and Kwasinski had probable cause to arrest Mearday for both aggravated battery and resisting or obstructing a peace officer. While on the ground, Mearday struggled and moved his arms and legs. Mearday also kicked Brosnan in the groin. Given these circumstances, it was reasonable for Bemis, Brosnan, Thompson and Kwasinski to believe that Mearday was intentionally or knowingly making physical contact with them. Therefore, the officers had probable cause to arrest Mearday for aggravated battery. *See* 720 ILCS 5/12(b)(6) (defining "aggravated battery" as committing a battery on a person known to be a peace officer while he is engaged in the execution of his

16

official duties). Similarly, the officers also had probable cause to arrest Mearday for "resisting or obstructing a peace officer."[16] *See* 720 ILCS 5/31-1 (it is a misdemeanor when a person "knowingly resists or obstructs the performance by one known to the person to be a peace officer . . . of any authorized act within his official capacity"). Mearday resisted his handcuffing pursuant to a *Terry* stop. His struggling and resistance ripened the reasonable suspicion that led the officers to initially seize Mearday into probable cause to arrest him. Because the officers reasonably concluded that they had probable cause to arrest Mearday, they are entitled to qualified immunity on the wrongful arrest claims as well.[17]

### 3. Excessive Force

Although Defendant Officers are entitled to qualified immunity because the stop and arrest were both reasonable under the Fourth Amendment, we must also address whether Officers Bemis, Brosnan, Thompson and Kwasinski used excessive force in stopping and arresting Mearday in violation of the Fourth Amendment. Qualified immunity is available as a defense to excessive force claims. *See Saucier*, 533 U.S. at 205 (2001) (qualified immunity applies in excessive force cases, just as it does in other Fourth Amendment cases); *McNair v. Coffey*, 279

---

[16] Mearday was not charged with resisting or obstructing a peace officer. Nevertheless, as Defendant Officers argue, we may still consider the possible charge in determining whether the officers had probable cause to arrest Mearday as it is closely related to the aggravated battery charge and arises out of the same facts that led to the aggravate battery charge. *Williams v. Jaglowski*, 269 F.3d 778, 783 (7th Cir. 2001).

[17] Because we conclude that Mearday's arrest was not violative of the Fourth Amendment, we also find that the subsequent searches of Mearday at the 25th District police station were not improper. *U.S. v. Robinson*, 414 U.S. 218, 235 (1973) (holding that in the case of a lawful arrest, a full search of the person is a reasonable search under the Fourth Amendment). Therefore, Defendant Officers are entitled to qualified immunity on Mearday's unreasonable search claims.

F.3d 463 (7th Cir. 2002). A plaintiff shows a violation of the Fourth Amendment if he can

establish that an officer's force was objectively unreasonable in light of the facts and

circumstances confronting the officer. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Once

again, we must determine the reasonableness of the officers' actions "without regard to their

underlying intent or motivation." *Id.* (citations omitted). In deciding whether the officers' use of

force was reasonable, we must look at the totality of the circumstances. *Id.* at 396 (totality of the

circumstances includes "the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest

or attempting to evade arrest by flight"). *Id.* at 396. Our reasonableness determination takes into

account "the fact that police officers are often forced to make split-second judgments – in

circumstances that are tense, uncertain and rapidly-evolving – about the amount of force that is

necessary in a particular situation." *Id.* at 397.

　　　Officers Bemis, Brosnan, Thompson and Kwasinski used handcuffs and drawn guns to

effectuate their stop and arrest. This case involves no allegations of beating or punching. Bemis

started to reach for his gun when Mearday was walking backward and Bemis thought he saw

Mearday reach under his coat. Mearday then turned and started for the door of his house. When

Mearday could not open the door to his home, he turned and saw Bemis and Thompson with

their guns aimed at him. At this point, Mearday yielded to the officers' display of authority and

was seized. Bemis then attempted to handcuff Mearday at which point the scuffle ensued.

　　　First, we must determine whether the officers used excessive force in handcuffing

Mearday. The officers had reasonable suspicion that Mearday was involved in criminal activity

because he fled from police in a high crime area where there had recently been a police shooting.

18

The Seventh Circuit has held that an officer acts reasonably when he handcuffs a fleeing person about whom he has a reasonable suspicion of criminal activity. *Voida*, 963 F.2d at 958 (7th Cir. 1992) (maintaining that handcuffing is appropriate to accomplish the purposes of an investigatory stop). Given the totality of the circumstances in this case, the use of handcuffs during the investigatory stop was not excessive. The officers were engaged in a serious task – trying to locate the suspected shooter from the previous night. Bemis thought that Mearday might be armed, and Mearday fled from the police. This encounter occurred within three blocks of the recent police shooting. Although Mearday yielded to the police and raised his arms in the air, given the severity of the crime the officers were investigating, Bemis' belief that Mearday might be armed and Mearday's flight from police, the officers were justified in using handcuffs to effectuate the investigatory stop.

Second, we must determine whether Bemis and Thompson's display of weapons was a violation of the Fourth Amendment. Bemis drew his gun when he thought he saw Mearday reach under his coat and he suspected that Mearday might be armed. After Mearday ran to the front door of his house and looked back over his shoulder, he saw Bemis with his gun aimed at him and Thompson with the shotgun resting on the hood of the police car aimed at him. Once again, we must look at the totality of the circumstances. While the use of drawn guns – especially a shotgun – during an investigatory stop might ordinarily be excessive, it was reasonable in the instant scenario. Once again, we point out that the officers were in a high crime area, investigating a police shooting by a suspect using a machine gun. The officers were within blocks of the shooting location. Bemis thought that Mearday might be armed. Therefore, Bemis was justified in drawing his service weapon in light of the totality of the circumstances. *See U.S.*

19

*v. Tilmon*, 19 F.3d 1221, 1226 (7ᵗʰ Cir. 1994) (holding that the display of force during an investigatory stop is warranted if the officer has a justifiable fear for personal safety). In addition, Thompson's aiming the shotgun at Mearday after he ran to the door of his house was not excessive given the dangerousness of the officers' mission that day and Mearday's flight from the police. *Id.*

In short, the totality of the circumstances warranted the use of handcuffs and the display of weapons in stopping Mearday. Mearday has not established a violation of the Fourth Amendment on his excessive force claim. Therefore, Defendant Officers are entitled to qualified immunity on Mearday's excessive force claim.

### 4. Potential First Amendment Retaliation Claim

Finally, although Mearday's counsel has not directly argued a First Amendment claim, the Court itself has reviewed whether Mearday's retaliation claim created a material issue of fact with respect to Mearday's First Amendment right to petition the government for redress of grievances.[18] Defendant Officers argue that Mearday's retaliation allegations of retaliatory animus are irrelevant because they go to intent, which is not part of the qualified immunity analysis. Intent, however, is relevant to the first prong of the qualified immunity analysis – whether the plaintiff alleged a deprivation of a constitutional right. *Crawford-El v. Britton*, 523 U.S. 574, 588-89 (1998). Allegations of intent or state of mind are essential elements of certain constitutional claims, among them First Amendment retaliation claims. *Id.* at 592. Therefore,

---

[18] Although not directly pled, the Court read Mearday's retaliation claim as potentially implicating the First Amendment. Mearday, in essence, appears to be arguing that he was stopped, arrested and charged for crimes in retaliation for filing charges and participating in the Police Board proceedings against Comito and Thiel.

the Court may consider Defendant Officers' motivations when analyzing the first prong of the qualified immunity analysis with reference to Mearday's First Amendment retaliation claim.

The Court has carefully reviewed the voluminous pleadings in this case, and closely examined the undisputed evidence in the record, in the light most favorable to Mearday in an effort to determine if Mearday has established a material issue of fact on his central allegation that the Defendant Officers were motivated by retaliatory animus. As evidence of retaliation, Mearday primarily points to: (1) the timing of the arrest within a week of Comito and Thiel's termination; (2) the police "drive-bys" and light shining into Mearday's bedroom; (3) the police audio tapes of conversation in the early hours of March 19, 1998 regarding Mearday; and (4) the "We know who the f— you are" statement made by one arresting officer after Mearday identified himself.

After this extensive review, we conclude that Mearday has not shown enough facts which would support a rational jury verdict in his favor. There are only two facts which circumstantially support Mearday's claim. The first is the timing sequence. Mearday heavily relies on the fact that he was arrested one week after Comito and Thiel's termination became final on March 12, 1998. The Seventh Circuit, however, has pointed out on numerous occasions that while timing may circumstantially support a retaliation claim, timing alone cannot support a finding of retaliation. *See, e.g., Pugh v. City of Attica, Indiana*, 259 F.3d 619 (7th Cir. 2001) (holding in First Amendment retaliatory discharge suit that "timing of the action, without more, is insufficient to establish the protected activity as a motivating factor") (citation omitted). Moreover, the termination proceedings against the two officers had been ongoing and well

publicized for a long period of time. Mearday's formal charge against Comito and Thiel was filed long before the termination finding by the Police Board.

The other fact that somewhat supports Mearday's retaliation claim is the arresting officer's statement that he knew who Mearday was. Yet, the fact that this statement was only in response to Mearday announcing who he was diminishes its significance. If the police officer had voluntarily announced that he knew who Mearday was without any prompting by Mearday, this statement, in combination with the timing factor, may have established a material issue of fact on retaliatory animus. Instead, in view of the undisputed facts, the Court finds that the facts, when viewed in their totality, do not establish a material issue of fact on retaliatory animus.

Mearday's other evidence does not point to retaliatory animus on the part of Defendant Officers. First, the police tapes do not support Mearday's retaliation claim against *these particular officers*. The tapes evidence conversations – immature and inappropriate ones – by unidentified officers which only evidence that Mearday was a topic of banter among the officers on duty that night. Such banter, by unidentified officers hours before the arresting officers came on duty, cannot support retaliatory animus on the part of Defendant Officers. Second, Mearday cannot tie any of the Defendant Officers to the harassment he experienced at his home after the September 1997 beating. Such harassment, likely in retaliation for the charges filed against Comito and Thiel, is intolerable and likely grounds for a retaliation suit against the officers involved. There is, however, no evidence that Defendant Officers were involved in this harassment.

### 5. Malicious Prosecution

Mearday's final Fourth Amendment claim is one of malicious prosecution. An essential

22

component of Mearday's malicious prosecution claim is his allegation that drugs were planted on him at the police station, and that charges were thus wrongfully brought against him. Although we have concluded that the stop, arrest and searches were reasonable under the Fourth Amendment, an allegation of drug planting, if supported, is certainly beyond the bounds of the Fourth Amendment. The Seventh Circuit recently held, however, that "the existence of a tort claim under state law knocks out any constitutional theory of malicious prosecution." *Newsome v. McCabe*, 256 F.3d 747, 750 (7th Cir. 2001).[19] Illinois law provides a cause of action for malicious prosecution. *See, e.g., Meerbrey v. Marshall Field & Co., Inc.*, 564 N.E.2d 1222 (1990). In fact, Mearday alleges a state claim of malicious prosecution in Count IV of his second amended complaint. Therefore, Mearday's Fourth Amendment malicious prosecution claim must be dismissed. We decline, however, to exercise jurisdiction over Mearday's state claim for malicious prosecution as we have granted summary judgment to Defendant Officers on Mearday's federal claims. 28 U.S.C. § 1367(c)(3). Instead, we remand Mearday's state malicious prosecution claim (Count IV) to the state circuit court from which it was removed.

---

[19] Plaintiff appears to be aware of this development in the law as he concedes in his response to the City's motion for summary judgment that his "malicious prosecution claims under Count II (constitutional claim) should be dismissed." (R. 157, Pl.'s Resp. to City's Mot. for Summ. J. at 14.) Plaintiff erred in including this concession in his response to the City's motion as the federal malicious prosecution claim in Count II is against Defendant Officers, not the City.

The Seventh Circuit left open the possibility of recasting a constitutional malicious prosecution claim as a due process claim. *Newsome*, 256 F.3d at 752-53 (citing *Brady v. Md.*, 373 U.S. 83 (1963)). Because Mearday has had ample opportunity to argue his malicious prosecution claim as a due process claim and has not, we will not address that possibility. Therefore, Mearday's federal malicious prosecution claim is dismissed.

## II. Claims Against the City

Mearday also alleges a § 1983 claim against the City for failing to supervise and discipline officers and investigate complaints. (*See* R. 15, Second Am. Compl., Count III; R. 157, Pl.'s Resp. to City's Mot. for Summ. J. at 15.) The City argues that Mearday cannot establish municipal liability because he cannot show an actual policy of not supervising or disciplining officers or investigating complaints, or that a deliberately indifferent policymaker acquiesced in such a practice directly causing the alleged injury.

To establish municipal liability under § 1983, Mearday must meet the elements set out by *Monnell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and its progeny. First, Mearday must establish that he has suffered a constitutional injury. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). We proceed no further than this, however, because Mearday's claim against the City fails at this initial step. Because Mearday did not establish a violation of the Fourth Amendment and the Court has granted summary judgment to Defendant Officers, we must also grant summary judgment to the City.[20] *Id.*

## CONCLUSION

This Court's views on the need to publicly air, debate, review and eliminate police misconduct are well established. *See Doe v. Marsalis*, 202 F.R.D. 233 (N.D. Ill. 2001) (granting Chicago Reader, Inc.'s petition to intervene and obtain access to documents related to settled police misconduct suit); *Wiggins v. Burge*, 173 F.R.D. 226 (N.D. Ill. 1997) (similarly granting Chicago Reader, Inc.'s petition to intervene and obtain access to documents related to settled

---

[20] Because we have concluded that the City is entitled to summary judgment on the federal claims, the Court declines to exercise jurisdiction over Mearday's state law claim against the City for *respondeat superior* (Count V). 28 U.S.C. § 1367(c)(3).

police misconduct suit). The Court deeply sympathizes with Mearday's experiences. On September 26, 1997, Mearday suffered a brutal beating by Chicago police officers. As a result of that beating, he has obviously suffered significant pain and trauma. Perhaps, as Mearday argues, his nervous reaction to Defendant Officers on March 19, 1998 was precipitated by his prior experiences with Chicago police officers. The Court cannot, however, let our sympathy for Mearday's history interfere with our difficult task in this case. The Court was asked to determine whether Defendant Officers violated Mearday's Fourth Amendment rights on March 19, 1998. Because we are constrained by the limits of Fourth Amendment analysis, we must – given the totality of the circumstances – find the Defendant Officers' conduct objectively reasonable.

Thus, for the foregoing reasons, we grant Defendant Officers' motion for summary judgment on Counts I and II, (R. 145-1), and the City of Chicago's motion for summary judgment on Count III, (R. 136-1).[21] Counts IV and V are hereby remanded to the state circuit court from which they were removed. We deny Defendant Officers' motions to strike, (R. 163-1, 164-1), as moot. The Clerk of the Court is instructed to enter final judgment, pursuant to Federal Rule of Civil Procedure 58, in favor of Defendant Officers and the City and against Mearday on Counts I, II and III which involved federal claims. This Court declines to exercise supplemental jurisdiction over the remaining state law claims.

ENTERED:

Judge Ruben Castillo
United States District Court

Dated: March 28, 2002

---

[21] In view of this ruling, the plaintiff's pending motion to compel against the United States Attorney, (R. 182-1), is hereby denied without prejudice to its renewal in state court.

25